## IN RE 1115 LEGAL SERVICE CARE.

Argued January 20, 1988—Decided May 24, 1988.

346

*Richard M. Greenspan* argued the cause for appellant, 1115 Legal Service Care.

*Sarah T. Darrow,* Deputy Attorney General, argued the cause for respondent, Committee on Attorney Advertising (*W. Cary Edwards,* Attorney General of New Jersey, attorney, *Michael R. Clancy,* Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

With the exception of nonprofit legal aid or public interest law firms, the Rules of Professional Conduct ("RPC") prescribe that the name under which a lawyer or law firm practices is permitted to contain only "the full or last names of one or more of the lawyers in the firm or office or the names of a person or persons who have ceased to be associated with the firm through death or retirement." RPC 7.5(a). The Committee on Attorney Advertising ("Committee") correctly interpreted this rule as barring a non-commercial organization providing legal service by its attorneys on a prepaid basis from using a letterhead referring to its organizational or plan name because that name itself did not refer to or contain the name of any lawyer actually providing legal services. Implicated in this decision is the preliminary issue of whether such an organization is improperly engaged in the practice of law.

We conclude that non-commercial, internally-staffed prepaid legal service plans of the type dealt with in this opinion serve important and useful functions and provide needed services. Accordingly, we call on the Civil Practice Committee to recom-

mend for our consideration a revision of our Court Rules expressly to authorize such organizations to engage in the practice of law.

We direct, further, that the Rule currently restricting the content of lawyer and law firm names should be modified to permit a non-commercial organization engaged in providing prepaid legal services to use its own name as part of its official designation or professional letterhead in connection with its practice of law, subject to certain additional conditions relating to full disclosure

## I.

"1115 Legal Service Care" (the "program", "service" or "plan") is the name used by a prepaid legal service program funded by employers pursuant to a collective bargaining agreement negotiated with 1115 Joint Board, a labor organization. The program is said to qualify as a tax-exempt group legal service plan under Section 120 of the Internal Revenue Code, 26 *U.S.C.* § 120. It is further said to be an employee benefit plan defined and regulated under provisions of the Employee Retirement Income Security Act ("ERISA"), 29 *U.S.C.* § 1001 to –1461, and to be organized in accordance with Section 302 of the Labor Management Relations Act ("LMRA") as amended, 29 *U.S.C.* § 186. The program operates in three states, New Jersey, New York, and Florida. The plan operates in New Jersey and New York with its own attorneys, while legal services in Florida are provided by a private law firm retained by the program.[1]

1115 Legal Service Care attorneys are employed directly by the plan on a full-time basis and work exclusively on matters

---

[1]Prior to 1984 the program retained a private law firm to provide legal services in New Jersey for the union members it covers. This outside firm was the subject of an opinion in an unrelated matter in *In re Sackman,* 90 *N.J.* 521 (1982). The program is now one that is "in-house," using its own full-time staff attorneys to provide legal services in New York and New Jersey.

covered by the plan. The clients of the plan are employee members of 1115 Joint Board. The attorneys are not permitted to accept as clients persons not covered by the service, nor are they permitted to recommend other counsel to such persons. The attorneys thus do not offer or provide legal services to members of the general public. They are not affiliated with any private law firm, and do not constitute a partnership or professional corporation. The program itself is administered by a board of trustees, representing both labor and management, who do not involve themselves in the rendering of legal services. All pleadings are signed in the name of the individual staff attorney assigned to a particular matter, with the name of the service's Legal Director also indicated, as well as the address of the program's office at which the matter is being handled. Each of the program's six offices maintains its own Attorney's Trust Account, to which only program attorneys have access.

The plan and its attorneys in the New York and New Jersey offices seek to use the proper name "1115 Legal Service Care" on the letterhead of their office stationary, which is used in professional correspondence in the regular practice of law. The name quite obviously focuses on the identity or nature of the program as one involving legal representation and services in connection with the interests of the 1115 Joint Board labor organization. This is made clear by additional information that appears at the bottom of the page containing the letterhead, namely, the words "A Multi-Employer Funded Legal Service Plan Established Through Collective Bargaining." The letterhead also contains other information. It lists the addresses and telephone numbers of the program's six offices, two of which are in New Jersey and four in New York. It further lists the names of thirteen lawyers, accompanied by a parenthetical indication of the jurisdiction or jurisdictions in which each is licensed to practice law. The first name on this list of attorneys is that of the Legal Director, who is indicated as being licensed to practice in both New York and New Jersey. There

is no reference on the letterhead to any nonlegal personnel associated with the program or to any administrative offices.

In a letter dated March 20, 1987, counsel for the program's trustees requested that the Committee render an opinion regarding the propriety of the use of the letterhead. On April 6, 1987, the Committee responded with a letter ruling that the use in a letterhead of the name "1115 Legal Service Care" violated RPC 7.5(a). We granted the Petition for Review of this ruling. 108 *N.J.* 668 (1987).

## II.

While this matter arose originally from a request to validate the use of the plan's name, implicit in this dispute is the more fundamental question about the ability of a staff-operated prepaid legal service plan to engage in the practice of law in New Jersey.[2] We deal with this issue initially.

Under current regulations the only type of legal entities or associations permitted to practice law, aside from law firms and professional corporations, are charitable and public interest legal service corporations. *R.* 1:21–1. Apparently, in this case,

---

[2]Petitioners assert in a footnote to their brief, without any supporting authority, that state regulation of the employee benefit plan's provision of legal services is preempted under the Employee Retirement Income Security Act ("ERISA"), 29 *U.S.C.* § 1114. This assertion contradicts the traditional presumption that state law is not preempted by a federal statute unless such a Congressional purpose is "clear and manifest." *Ray v. Atlantic Ritchfield Co.,* 435 *U.S.* 151, 157, 98 *S.Ct.* 988, 994, 55 *L.Ed.*2d 179, 188 (1978). No such purpose can be gleaned from § 1144 with respect to state laws tangentially related to covered benefit plans. *Stone v. Stone,* 450 *F.Supp.* 919, 932 (N.D.Cal. 1978); *Western Elec. Co. v. Traphagen,* 166 *N.J. Super.* 418, 425 (App.Div.1979). We agree with the conclusion of New York's high court that the "Federal statute may, perhaps, pre-empt the regulation of union prepaid legal services plans, qua plans, but does not reach the professional licensure and regulation of lawyers, qua lawyers, who would render legal services under the plans." *Feinstein v. Attorney General,* 36 *N.Y.*2d 199, 205–06, 366 *N.Y.S.*2d 613, 618, 326 *N.E.*2d 288, 292 (1975). *Accord Matter of UAW Legal Servs. Plan,* 69 *A.D.*2d 995, 416 *N.Y.S.*2d 133, 134 (App.Div.1979); *Alaska State Council of Carpenters v. Local 1281,* 727 *P.*2d 306, 310 (Alaska 1986).

the plan has registered with the Supreme Court as a provider of legal services pursuant to RPC 7.3(e)(4). The Committee concedes that by complying with that RPC's restrictions, the 1115 Legal Service program can properly pay for legal services on behalf of its members. It further concedes that attorneys as individuals are permitted to provide legal services under the program. The Committee urges, however, that the organization itself is not authorized to practice law. It also stresses that a lawyer may practice in association with others only as a member of a partnership, a professional service corporation (*R.* 1:21–1A), or a nonprofit public interest law firm (*R.* 1:21–1(d)), and further, that nonlawyers cannot profit from the rendition of legal services under RPC 7.3(e)(4).

We agree that under our current Rules the practice of law within an organizational framework such as that of the program is not permitted. This, in turn, prompts us to inquire whether the nature of this organization's practice should lead us to carve out an exception to the restriction against practice by attorneys who are employees of a corporation or similar entity. In the past we have found the occasion to provide such an exception. Thus, in *In re Education Law Center, Inc.*, 86 *N.J.* 124, 140 (1981), we endorsed the principle that "non-profit corporations operating for charitable and benevolent purposes" could appropriately be authorized to engage in the practice of law, provided that such organizations operate in a manner that would not implicate the concerns underlying the prohibition against the practice of law by corporations. *See R.* 1:21–1(c).

In that case it was claimed by Education Law Center, Inc. that it, as an "organization," did not practice law. 86 *N.J.* at 131 n. 3, 135 n. 5. We rejected this claim, noting that "[t]he individual responsibility of Education Law Center staff attorneys for the cases which they are assigned and their primary obligation to their clients is no different from that of lawyers in law partnerships or professional corporations, organizations which obviously practice law." *Id.* at 135 n. 5. Under this reasoning, 1115 Legal Service Care is also engaged in the

practice of law. Because the plan does not purport to be "operating for charitable and benevolent purposes," under our current Rules this entity itself is engaged in the unauthorized practice of law.

We emphasized in *Education Law Center* that the central concern motivating the ban on the corporate practice of law is that nonlawyers might be in a position to direct the rendition of legal services. 86 *N.J.* at 135. "An overriding fear in this regard is that the corporation may place its own interests, whether political goals or profits, ahead of the interests of its clients...." *Ibid.* In *Education Law Center*, we also recognized that this problem is as great with respect to nonprofit public interest law firms pursuing certain social goals as it is with respect to entities pursuing profit. *Id.* at 136. Nevertheless, on the record presented, we credited the Education Law Center's assurances that their clients' interests would predominate and that all cases would be "aggressively prosecuted long after law reform issues have evaporated[.]" *Id.* at 131. Accordingly, we authorized the amendment of the rules to permit such an entity lawfully to engage in the practice of law.

1115 Legal Service Care does not come within the exemption that was created for non-profit corporations "operating for charitable and benevolent purposes," such as Education Law Center, Inc. 1115 Legal Service Care operates for different purposes, advances different objectives and caters to a different clientele. Nevertheless, its functions and operations in providing legal services, if not its purposes, are similar to those validated by our *Education Law Center* opinion and codified by *Rule* 1:21–1(d). It renders legal services through qualified lawyers on a prepaid basis to clients with a common nexus— their membership as employees of a labor organization—in need of the professional services of lawyers.

In addition, 1115 Legal Service Care Center does not appear to have any agenda that could conceivably conflict with or be furthered at the expense of its clients. Indeed, Education Law

Center, Inc. apparently accepted or rejected cases for ideological reasons, 86 *N.J.* at 135. In contrast, 1115 Legal Service Care accepts all cases on behalf of clients covered by the benefit plan. It thus provides legal services for all eligible clients. In other respects, the two organizations operate in a similar fashion. The lawyers in the organization are fully responsible for the rendition of legal services. Nonlawyer trustees are kept at a distance from the exercise of professional judgments and involvement in individual cases. *Ibid.* Hence, the assurances demanded of Education Law Center relating to case and client selection would be unnecessary here to insulate nonlawyers from the practice of law in terms of deciding which matters or clients would be accepted by the organization.

There is reason to believe that the practice of law by staff-operated prepaid legal service plans is a useful innovation, serving the needs of many persons who may be neither poor enough to secure legal aid nor wealthy enough to have ready access to traditional law firm services. "In a rapidly changing world, we should be careful to remain responsive to the public's needs." *In re Professional Ethics Advisory Opinion 475*, 89 *N.J.* 74, 79, app. dismissed, 459 *U.S.* 962, 103 *S.Ct.* 285, 74 *L.Ed.*2d 272 (1982) [hereinafter *"In re Opinion 475"*]. If groups of persons combine for valid economic, social, or other reasons not inconsistent with public policy and seek in conjunction with their mutual interests to provide legal services to their constituency, we see no supervening interest bearing on the regulation of the legal profession that should militate against such efforts.

We believe that 1115 Legal Service Care is organized in such a manner as to prevent the abuses at which our Court's regulatory strictures over the profession are directed. It is a vehicle for making legal services available to persons who might not otherwise be able to obtain such services. It provides services to clients within the framework of conventional attorney-client relationships. Individual attorneys providing legal services remain professionally responsible and accountable for their conduct. No control over the rendition of legal

services is retained or exerted by non-lawyers. No profits generated by the practice of law enure to the organization itself. The practice of law under the aegis of the plan, in terms of the matters handled and the client interests served, is in no way inconsistent with or inimical to the regulatory standards governing the legal profession.

We are therefore satisfied that the useful and needed legal services that are provided by 1115 Legal Service Care justifies its continued existence. Although under current Rules the plan is engaged unlawfully in the practice of law, we find that these Rules fail to accommodate sound policy in the face of changing realities. They should be reassessed. Just as, six years ago, similar considerations led to the creation of an exception to the restrictions on the authorized practice of law, and to the restrictions on law firm appellations, for the benefit of nonprofit firms "operating for charitable and benevolent purposes," *Education Law Center, supra*, 86 *N.J.* at 140, so today does such an assessment lead us to create an exception for non-commercial, staff-operated, prepaid legal service plans serving a set clientele group. Accordingly, we feel that such organizations should be authorized to practice law provided that they comply with our other rules and standards regulating such practice. We therefore direct a revision of our Rules to reflect this determination.

### III.

The question that incepted these proceedings was the propriety of the use of the name "1115 Legal Service Care" as the official name or designation of this group of lawyers as part of the plan's professional letterhead.

It is undisputed that application of RPC 7.5(a) currently bars the use of the name "1115 Legal Service Care" as a law firm designation. While there may be no dispute over whether in fact the use of such a name is prohibited by the RPC, we cannot avoid considering the question of whether the purpose and policy of our strictures concerning official lawyer designations should appropriately encompass a restriction against the use of

a name by an organization such as "1115 Legal Service Care." In dealing with the scope of the policy of this RPC, therefore, we should be mindful of the larger context in which it is applied.

■ Preliminarily, it is well to note that the method by which attorneys designate themselves in connection with their practice of law is a form of commercial speech, and, as such, is constitutionally protected only to the extent that it conveys information that facilitates honest transactions. *In re Opinion 475, supra,* 89 *N.J.* at 82–83; *cf. Friedman v. Rogers,* 440 *U.S.* 1, 11, 59 *L.Ed.*2d 100, 111 (1979) ("The use of trade names in connection with [an] optometrical practice ... is a form of commercial speech and nothing more."). The rationale behind our regulation of how lawyers identify themselves is that there is a need to protect the public from being misled and to ensure that the nature of an attorneys' practice is clearly communicated. *See Friedman,* 440 *U.S.* at 13, 99 *S.Ct.* at 896, 59 *L.Ed.*2d at 112 (balancing the potential communicative value in a trade name against its potential to deceive or mislead); *see also IMO Felmeister & Isaacs,* 95 *N.J.* 431, (1984) (attorney advertising must be regulated to avoid confusion); *cf. In re Weiss, Healey & Rea,* 109 *N.J.* 246 (1987) (name used by lawyers inaccurately indicated that they were engaged in the practice of law as a partnership). Nevertheless, the use of such names or designations by lawyers is intimately connected with the practice of law, implicating the need for professional regulation. As we recently noted in *In re Weiss, Healey & Rea, supra,* 109 *N.J.* at 251 (1987) (quoting *In re Opinion 475, supra,* 89 *N.J.* at 87) "[u]nder our rules, law firm names are 'official' designations, and therefore are regulated more carefully [than commercial speech in] ordinary advertising."

In this case, the letterhead used by the program does not mislead or confuse. It clearly indicates that its attorneys are

not engaged in the general practice of law in the sense of offering legal services to the public at large; their legal services are offered and provided only to members of the labor organization, 1115 Joint Board. The letterhead complies with the current RPC to the extent that it expressly lists the actual attorneys, and their respective jurisdiction of licensure, who are available to provide legal services. Thus, this format is not really inconsistent with the basic policies underlying our regulations governing law firm designations, which militate in favor of clear disclosure. The nature of the legal practice of the program in terms of attorneys providing legal services and clients receiving such services is evident from its letterhead. Consequently, the use of this letterhead does not conflict with the basic objective of clear disclosure of our Rules of Professional Conduct.

Accordingly, we determine that the use of the letterhead by reference to the name of the program, "1115 Legal Service Care," is deemed to be authorized, and an amendatory Rule expressly codifying this determination shall be issued.

## IV.

In sum, we reaffirm the policies on which the general prohibition of the practice of law by non-attorney-directed entities is based. RPC 7.3(e)(4), (f); *R.* 1:21–1; *see* RPC 5.4, 5.5. Nevertheless, we conclude that the useful service provided by 1115 Legal Service Care requires an exception to that prohibition. We therefore call on the Civil Practice Committee to consider and recommend an amendment of our Rules to permit the practice of law by non-commercial, staff-operated prepaid legal service plans that serve particular clientele groups. We also rule that RPC 7.5(a) should be modified to permit entities such as this to use their organizational name for purposes of identification, providing that, as done in this case, the organization also disclose the names of responsible attorneys who are authorized to practice in New Jersey and provide some indication of the

limited nature of the clients they permissibly serve or the legal services they render.

Accordingly, the determination of the Committee on Attorney Advertising is reversed. The matter is remanded for further proceedings in accordance with this opinion.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.